UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

BARBARA RUBENS,                          :

                    Plaintiff,           :

          - against -                    :          **OPINION**

ROY L. MASON and MORGAN SHELSBY          :          01 Civ. 5004 (DC)
CARLO DOWNS & EVERTON f/k/a
MASON KETTERMAN & MORGAN, P.A.,          :

                    Defendants.          :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    RONEMUS & VILENSKY
                    Attorneys for Plaintiff
                        By:  Michael B. Ronemus, Esq.
                    112 Madison Avenue
                    New York, New York  10016

                    WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
                    Attorneys for Defendants
                        By:  Mark K. Anesh, Esq.
                             Michael A. Carrasco, Esq.
                    150 East 42nd Street
                    New York, New York  10017

**CHIN, D.J.**

          In this diversity case, plaintiff Barbara Rubens
accuses defendants Roy L. Mason and Morgan Shelsby Carlo Downs &
Everton, formerly the law firm of Mason Ketterman & Morgan, P.A.
("MKM"), of legal malpractice.  She contends that defendants
committed numerous negligent acts in their representation of her
at an arbitration against the Dalkon Shield Claimants Trust (the
"Trust") for injuries allegedly sustained from her prolonged use
of the Dalkon Shield intrauterine device ("IUD").  She lost at
the arbitration and now asserts that but for defendants'
negligence, she would have prevailed.

Defendants move for summary judgment dismissing the complaint.  Plaintiff cross-moves to strike affidavits and preclude the testimony of Orran Brown, an attorney who represented the Trust against Rubens in arbitration, and Denise Dunleavy, an expert witness.

In deciding defendants' motion, the Court must determine whether a reasonable jury could find that defendants committed malpractice and, if so, whether that malpractice was the cause of Rubens's loss.  The reasonableness of defendants' actions must be interpreted in light of all the circumstances, however, and those circumstances included the following: MKM was operating under enormous time constraints.  It was approached by Rubens as substitute counsel in June 1998 with the hearing scheduled for only two months away.  Pre-hearing disclosures had already been made by Rubens's prior attorney and discovery was closed.  Under the applicable rules, the arbitration had to be completed in three days.  Moreover, Rubens presented a difficult claim: she was challenging the Trust twenty-five years after her IUD was inserted and twelve years after it was removed.  At the outset, Mason informed Rubens that she only had a 50/50 shot of success.  In light of all these circumstances, it is hard to second guess the judgments defendants made in the course of their representation.

Considering the evidence as a whole, I conclude that no reasonable juror could find that defendants committed legal malpractice.  In reaching this decision, I have not relied on the

affidavits of Brown and Dunleavy.  Accordingly, defendants'
motion for summary judgment is granted and plaintiff's cross-
motion is denied as moot.

**BACKGROUND**

**A.    Facts**

The following facts are drawn from the pleadings and
the parties' motion papers and supporting materials.  All
conflicts in the evidence have been resolved in favor of Rubens,
the party opposing summary judgment.

**1.    The Parties**

Rubens is a New York resident who sought compensation
from the Trust for injuries allegedly sustained through her use
of the Dalkon Shield IUD.  (Compl. ¶ 1; MKM Rule 56.1 Statement ¶
1).[1]  Rubens is also known by her maiden name, Barbara Krauss.
(Anesh Reply Aff. dated 12/30/02 Exs. F & G).

Mason is an attorney who lives in Maryland and is
licensed to practice law in Maryland and the District of
Columbia.  (Mason Aff. dated 12/12/02 ¶¶ 2-3; Mason Dep. at 15).
During the relevant time period, Mason was a shareholder of MKM.
(DX L; Mason Aff. dated 12/12/02 ¶ 5; Mason Dep. at 16).[2]

---

[1]    "Compl." refers to the Amended Complaint filed by
Rubens on January 24, 2002, and is only cited where defendants do
not dispute the fact in question, unless otherwise indicated.
Similarly, where one party's 56.1 Statement is cited, the other
side has not disputed the fact in question, unless otherwise
indicated.

[2]    "DX" refers to defendants' exhibits attached to the
affidavit of Mark K. Anesh dated May 18, 2005.

MKM, now known as Morgan Shelsby Carlo Downs & Everton, is a law firm organized under the laws of Maryland with its principal place of business in Maryland. (Compl. ¶ 4; DX L).

**2.** **The Dalkon Shield Claimants Trust**

In 1970, the Dalkon Shield IUD was introduced to the American public by manufacturer A.H. Robins Co. and marketed worldwide as a safe and effective method of contraception. <u>See</u> <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 475 (1996); <u>A.H. Robins</u> <u>Co. v. Piccinin</u>, 788 F.2d 994 (4th Cir. 1986) (providing history of the device and related litigation); <u>In re A.H. Robins Co.</u>, 406 F. Supp. 540 (J.P.M.L. 1975) (same). More than 2.2 million devices were sold in the United States alone, but by 1974, the IUD was recalled from the market because of an unusually high incidence of pelvic infection and spontaneous abortions. <u>See</u> <u>Piccinin</u>, 788 F.2d at 996; <u>In re A.H. Robins Co.</u>, 406 F. Supp. at 540-41; S. Rep. 94-33, at 1-2 (1975), <u>as reprinted in</u> 1976 U.S.C.C.A.N. 1070, 1071, 1975 WL 12507. Inundated by lawsuits, A.H. Robins Co. declared bankruptcy in 1985, and the Dalkon Shield Claimants Trust was eventually formed in 1989 to provide a mechanism for compensating women injured by their use of the device. (Compl. ¶ 8; Mason Dep. at 20). <u>See Reichel v. Dalkon</u> <u>Shield Claimants Trust</u>, 109 F.3d 965, 966 (4th Cir. 1997); <u>Piccinin</u>, 788 F.2d at 996. From 1989 to 2000, the Trust resolved

more than 400,000 claims, distributing close to $3 billion to nearly 200,000 women who had used the Dalkon Shield.[3]

The Trust created three options for claimants: Option 1 provided for the prompt settlement of smaller claims by the payment of a fixed sum; Option 2 resolved larger claims based on a schedule of payments for certain injuries supported by some medical proof; and Option 3 provided even greater awards through settlement discussions following more detailed proof by the claimant, who could then, if settlement discussions failed, proceed to alternative forms of dispute resolution, including binding arbitration or traditional litigation. See Reichel, 109 F.3d at 966.

### 3. Rubens's Use of the Dalkon Shield IUD

On March 23, 1973, Rubens's doctor inserted a Dalkon Shield IUD in her uterus. (Dec. at 1, 5; Tr. at 668; Steinberg Aff. ¶ 1).[4] Fourteen years later, in 1987, Rubens was hospitalized for pelvic inflammatory disease ("PID") and a tubal ovarian abscess. (Dec. at 1, 2, 4; Tr. at 106-07, 369-70, 416). See Rubens v. Mason, 387 F.3d 183, 185 (2d Cir. 2004). At the time, the IUD was still in place, but it was removed when

---

[3]     See Wolfgang Saxon, Robert R. Merhige, Jr., 86: Ordered Virginia Integration, N.Y. Times, Feb. 22, 2005, at B9 (profiling the life of federal judge who oversaw the Trust); Dalkon Shield Trust Shutting Down; Nearly $3 Billion Distributed, Associated Press, Apr. 29, 2000.

[4]     "Dec." refers to the underlying arbitration decision issued by Blair C. Fensterstock, dated October 1, 1998. "Tr." refers to the arbitration transcript of the proceedings on September 14, 15, and 17, 1998.

Rubens's PID was discovered by her treating physician, Winston Paley.  (Dec. at 2, 4-5; Tr. at 108, 374, 423-24).  Rubens was 42 years old.  (Tr. at 261; Rubens Dep. at 4).

### 4.  Rubens Commences Arbitration Proceedings

Rubens brought a lawsuit against the Trust alleging that the Dalkon Shield caused her PID, which led to infertility, depression, substantial loss of income, pain, and suffering.  (Dec. at 1).  See Rubens, 387 F.3d at 185.  After changing counsel twice, Rubens agreed to binding arbitration, which was initially scheduled for June 22, 1998.  (DX D; Rubens Dep. at 117, 123, 128, 151).  See Rubens v. Dalkon Shield Claimants Trust ("In re A.H. Robins Co."), 232 B.R. 855, 857 (E.D. Va. 1999).

Rubens retained Michael Pretl as her attorney for the arbitration.  (Rubens Dep. at 128-29; Mason Dep. at 63).  See Rubens, 387 F.3d at 185.  In May 1998, Pretl served pre-hearing disclosures on the Trust, identifying the witnesses Rubens was planning to call.  (PX 27; Rubens Dep. at 150-51).[5]  Rubens identified physicians Paley and Oscar Dodek, described as "medical causation experts" who would testify on the cause of Rubens's PID and resultant injuries.  (PX 27 ¶ 2).

### 5.  The Chlamydia Tests

Because one of the Trust's defenses was that genital chlamydia caused her PID, on June 3, 1998, Rubens had her blood drawn twice for two separate chlamydia tests.  First, Rubens had

_____

[5]  "PX" refers to plaintiff's exchibits attached to the affidavit of Michael B. Ronemus, dated July 1, 2005.

blood drawn in the presence of a Trust representative for a
chlamydia test requested by the Trust (the "Trust test").  (Tr.
at 298; Rubens Dep. at 190).  See In re A.H. Robins Co., 232 B.R.
at 857.  Then, Rubens visited Dr. Laura Corio for a gynecological
exam and had her blood drawn again for another chlamydia test
("Rubens's test").  (Tr. at 300-01, 454-56; Rubens Dep. at 186,
190; Mason Dep. at 38-39).

        Chlamydia test results are reported as a numerical
ratio, called a titer.  (Tr. at 390-91, 867-68).  The laboratory
conducts a series of dilutions with the sample and reagents --
1:1, 1:2, 1:4, etc. -- to determine the highest dilution point at
which a reaction indicating the presence of chlamydia antibodies
will still occur.  Based on this cutoff point, one can determine
the level of chlamydia antibodies in a person's blood as an
indication of past exposure to chlamydia.  A higher concentration
of antibodies in the blood will have a higher level of dilution
as the cutoff point for the reaction.  (Id. at 390-91, 392, 867-
68; Sweet Aff. dated 11/11/02 at 2).  But there is no
standardization among laboratories as to what dilution cutoff
point will be interpreted as a positive result.  (Tr. at 392).

        a.    **The Trust Test Results**

        The Trust test was performed by the Infectious Diseases
Laboratory at Indiana University and does not say on its face
whether the result is positive or negative.  (PX 12).  Instead,
the results are reported in titer for two species of chlamydia,
c. trachomatis, or genital chlamydia, and c. pneumoniae, a non-

genital strain that affects the respiratory system and does not cause PID. (Tr. at 394; PX 12; Sweet Aff. dated 11/11/02 at 2;). The result for genital chlamydia was reported as "Pos 1:32"[6] -- a positive result under the standards of that lab, where a titer of 1:8 or greater was considered positive. The result for c. pneumoniae was reported as "Pos 1:128" -- also positive in labs where, as here, a titer of 1:16 or greater was considered positive. (Tr. at 393-94; PX 12; Sweet Aff. dated 11/11/02 at 2). The Trust test has been referred to as displaying a positive result, not just by Trust attorneys, but also by plaintiff's own expert, physician Andrew Schachter. (Schachter Aff. ¶ 6). Even plaintiff and/or her husband at least initially interpreted this as a positive test for genital chlamydia and informed Mason and Schachter that the Trust test was positive. (PX 4; Schachter Aff. ¶ 3).

The Trust test report does not list any patient identifying information other than a six-digit number but indicates the specimen was received on June 4, 1998. (PX 12). Rubens had signed a sheet signifying that the identifying number on the report matched the number of the specimen drawn on June 3. (See Tr. at 638-39).

---

[6] The Trust test results for the antibody IgG (Immunoglobulin G) appear as a numerical ratio under the abbreviations "Pos" and "Neg," for positive and negative respectively. (PX 12). IgG levels become permanently elevated in the blood when a person's immune system forms antibodies to the infection. (Sweet Aff. dated 11/11/02 at 2). The results for a different antibody, IgM, appeared to be negative in both species. (PX 12).

### b. **Rubens's Test Results**

Meanwhile, Rubens had blood drawn by a lab technician, Kelly Payton, during a routine gynecological exam by Corio. No Trust representative was present. Quest Diagnostics Laboratory ("Quest") in San Diego tested the sample for chlamydia and the results came back negative. Chlamydia antibodies were not detected by the lab at a level that indicated past exposure to any particular species. (Tr. at 299-301, 393-95, 454-57; PXs 4 & 5; Mason Dep. at 45-46; Schachter Aff. ¶ 4).[7] The results were also reported in titer, but Quest used a higher cutoff than the Indiana lab for a positive result -- a titer of 1:32 or greater. (Tr. at 393-94; PX 5).[8] The report reads: "IGG TITERS OF 32 OR GREATER MAY INDICATE PAST EXPOSURE TO A PARTICULAR SPECIES." On the face of the report, the IgG titers for all three species were listed as <32 titer, i.e., a negative result. (PX 5).

It is worth noting though that the titer from the Trust test for genital chlamydia would have indicated past exposure under the Quest standards because it was right at the cutoff point, 1:32. Under the Quest standards, however, 1:32 was an equivocal positive result because the report also contained a

---

[7]    The lab's own legend on the face of the report indicated that titers below a certain ratio should be interpreted as "ANTIBODY NOT DETECTED." (PX 5).

[8]    As noted above, the Indiana Lab used an IgG titer of 1:8 as its positive cutoff. Quest Lab also referred to IgG antibody levels but tested for additional antibodies IgM and IgA as well. Quest Lab also tested for a third species of non-genital chlamydia that the Indiana Lab did not include, c. psittaci. (Tr. at 394; PX 5).

caveat that any titer of 1:128 or less could be due to cross-reactivity: "[IgG] TITERS OF 128 OR LESS MAY BE DUE TO CROSS-REACTIVE ANTIBODY OR A NON-SPECIFIC STIMULATION OF CHLAMYDIA ANTIBODY."[9]  (Id.).

The Quest report that Rubens received in the mail from Corio's office initially listed the patient's name as "Barbara Roberts."  On the face of the report, the surname "Roberts" appeared to be scratched out, and "Rubens" was handwritten. Rubens had no knowledge of how this occurred.  (Id.; Rubens Dep. at 198-99).[10]  The report is dated June 11, 1998, but indicates that the specimen was drawn on June 3 and received on June 8. (PX 5).  A handwritten note from Corio, also dated June 11, 1998, explained that Rubens was her patient and "had blood drawn at her request for chlamydia which were all normal.  The blood test was performed at Quest Diagnostic labs."  The note did not specify the date blood was drawn or the specimen number.  (PX 6).  Rubens testified at the arbitration that she had asked Corio to test for chlamydia on June 3 (Tr. at 299-300), but Corio's lab technician Payton gave conflicting testimony that it was not until five days later that she was instructed to order a chlamydia test from the lab (id. at 457).

---

[9]     The report also advises that a "FOUR-FOLD RISE IN TITER IS STILL THE BEST INDICATOR OF A SPECIFIC INFECTION, DEMONSTRATED BY . . . SAMPLES DRAWN 2-3 WEEKS APART" and "IGG TITERS IN RECENTLY INFECTED INDIVIDUALS ARE USUALLY GREATER THAN OR EQUAL TO 512."  (PX 4).

[10]     For purposes of this motion, I assume that Rubens was not trying to hide any potentially adverse results.

### 6. **Rubens Retains MKM**

In June 1998, Rubens decided she no longer wanted Pretl to be her lawyer and changed counsel for the third time. (DX D; Rubens Dep. at 121-23, 132).[11]  She consulted with MKM on June 15, 1998, and asked the firm to represent her instead. (PX 1; Mason Dep. at 33; MKM 56.1 Statement ¶ 2).  See Rubens, 387 F.3d at 185-86.  On July 1, 1998, Mason wrote Rubens a letter agreeing to take the case.  In the letter, he acknowledged "the problem of the positive chlamydia test" and that Dr. Robert Sweet would be a "marvelous witness" for rebuttal but "quite expensive."  He also cautioned Rubens that although her case was "a good one," she "only [had] a slightly better than 50/50 chance of winning" because the Trust's lawyers were "extremely experienced."  (PX 4).  Mason asked Rubens to sign and return a retainer, which she did on July 20, 1998, with some handwritten modifications. (Id.; Ronemus Aff. dated 11/14/02 Ex. 17).

At the time that MKM began representing Rubens, pre-hearing disclosures had long been served, expert witnesses named, and it was Mason's understanding that the discovery deadlines had not been extended so that no more depositions would be allowed. (PX 27; Rubens Dep. at 150-51; Mason Dep. at 64-65).  Althoughthe arbitration rules called for expert disclosures sixty days prior to the hearing and all other disclosures thirty days prior, Mason served supplemental pre-hearing disclosures on September 1, 1998,

---

[11]     Rubens had retained two other attorneys prior to Pretl to represent her against the Trust. (Rubens Dep. at 121-23).

naming Corio as an additional witness, and identifying records to be offered into evidence that included Rubens's test results from Quest. (PXs 2 (Rule 8) & 23).

### 7. **The Arbitration Hearing**

Rubens's arbitration against the Trust commenced in New York on September 14, 1998, before Blair C. Fensterstock. (DX E). See In re A.H. Robins Co., 232 B.R. at 857. The hearing had been re-scheduled twice from its initial date of June 22, 1998 -- first to August 17 when Rubens switched counsel, and finally to September 14 because Mason was unavailable in August. (PX 4; DX D).

At the arbitration, Rubens was required to prove by a preponderance of the evidence: "(a) that she used the Dalkon Shield, (b) that she was injured, (c) that the Dalkon Shield was the cause in fact and the proximate cause of her injury, (d) that she should receive compensatory damages for her injury, and (e) the amount of compensatory damages." (Dec. at 2; DX F at 21 (Rule 35)). On the issue of causation, Rubens argued that the string of the Dalkon Shield functioned as a "wick" and allowed bacteria to travel from the vagina to the uterus. (Dec. at 1). The Trust responded by asserting that (1) Rubens's PID was most likely caused by chlamydia and (2) the formation of "biofilm" prevents wicking. (Id. at 1-2).[12]

---

[12] The theory behind the biofilm defense is that the body's natural defense mechanism causes a protective film to form over the Dalkon Shield after implantation. This "biofilm" prevented the wicking of bacteria, and therefore prevented the

The hearing was limited to three days, with each party entitled to one and a half days in which to present its case. (DX F at 17, (Rule 28)).  Timing was an issue throughout the hearing, and on day three, the proceedings did not conclude until almost 7 p.m.  (See, e.g., Tr. at 607 (Mason stating he was aware that timing was an issue), 927 (arbitrator suggesting to Mason on final day to wrap it up), 1015 (end time 6:55 p.m.)).

MKM presented seven witnesses, including Rubens's treating doctor during her hospitalization in 1987, Winston Paley, and an independent expert, Oscar Dodek.  Both testified to a reasonable medical certainty that wicking from the Dalkon Shield, not genital chlamydia, caused Rubens's injuries.  (Dec. at 3-5; Tr. at 92-93, 101-02, 107-08, 385, 387).  Paley also testified that the IUD was "discolored, malodorous, grew out the organisms that caused the infection, and . . . was intimately involved with the source of the infection" and that the Trust test was positive due to cross-reactivity.  (Dec. at 4-5; Tr. at 385-86, 390, 440-41).  Dodek countered the Trust's "biofilm" defense by explaining how the wicking of bacteria, up the tail string of the IUD into Rubens's uterus, caused her PID.  (Dec. at 3-4; Tr. at 108, 134).  In addition, Kelly Payton, Corio's medical assistant, testified about drawing Rubens's blood and ordering the Quest chlamydia test.  (Tr. at 456-57).[13]

_____

Dalkon Shield from causing PID.  (Tr. at 831, 840, 846, 850-51).

[13]    Rubens, her son, and two other witnesses also testified regarding the extent of her damages.

Meanwhile, the Trust presented three witnesses, Myron Steinberg, Mary Jane Minkin, and Martin S. Wilder. Steinberg had been Rubens's gynecologist from 1972, before the IUD was inserted, until about 1981, and then again from 1990 to about 1998. (Tr. at 288, 665, 689-90, 734; Steinberg Aff. ¶ 3). Minkin was a doctor from the Yale School of Medicine, a frequent witness for the Trust, who discussed chlamydia titers and gave her opinion that PID can only be caused by a sexually-transmitted-disease ("STD") and therefore chlamydia was the likeliest cause of Rubens's PID. (Dec. at 5; Tr. at 526, 530-31, 539-40, 557-58). Wilder was a physician and microbiologist who testified about the causes of PID and refuted the wicking theory with a discussion of biofilm. He also explained cross-reactivity and chlamydia titers over Mason's vigorous objections. (Dec. at 6; Tr. at 845-46, 850-51, 862-71, 918).

Prior to the hearing, Mason had indicated his intention to object to the admission of the Trust test (PX 4), but at the hearing, he stipulated to admit the Trust test results in exchange for the admission of Rubens's test results (Tr. at 388, 458, 637-38; Mason Dep. at 113-17). The Trust test was admitted, along with a signature sheet linking Rubens to the test result. The Trust had also arranged for the paralegal who was present when Rubens's blood was drawn to be at the hearing. When Rubens identified the paralegal, Mason agreed to stipulate to the Trust test's admission. (Tr. at 636-38; Mason Dep. at 115-16). Rubens's test was also admitted, along with Corio's note stating

that she had ordered the test.  (Tr. at 458, 646-47; Mason Dep. at 115).[14]

### 8.   The Arbitrator's Decision

On October 1, 1998, Fensterstock rendered a decision in favor of the Trust, finding that "although [she] produc[ed] experts to support her theory of wicking," Rubens failed to prove causation by a preponderance of the evidence and "failed to adequately rebut the biofilm theory."  (Dec. at 6).  Fensterstock also determined that Rubens had not sufficiently proven compensatory damages.  (Id.).[15]

## B.   Prior Proceedings

MKM, on Rubens's behalf, moved to vacate, modify, or correct the arbitrator's decision in the United States District Court for the Eastern District of Virginia (PX 25), but the motion was denied on March 30, 1999.  See In re A.H. Robins Co., 232 B.R. at 864.

Rubens filed the complaint in this action on June 6, 2001, followed by an amended complaint on January 24, 2002.

---

[14]   The arbitrator also decided to allow Mason to use his untimely disclosed documents solely for impeachment, cross-examination, and rebuttal purposes.  (Tr. at 660; Mason Dep. at 163).

[15]   Specifically, Rubens had not shown "that she wanted to have children in 1987 or thereafter or . . . that she is infertile."  Furthermore, she did not "produce any verifiable evidence of her income or lost income . . . other than mere speculation."  (Dec. at 6).  While MKM did not raise this argument, the arbitrator's determination that Rubens failed to demonstrate damages provides an independent ground for finding that the alleged negligence by MKM did not cause her arbitration loss.

Defendants filed an answer and counterclaim on February 4, 2002. Following discovery, the parties simultaneously moved for summary judgment. Rubens moved for summary judgment as to liability. Defendants moved for dismissal of the complaint and judgment against Rubens on their counterclaim, pursuant to the retainer agreement, for (1) costs and expenses incurred in the arbitration and (2) attorneys' fees and costs incurred in this action to recover the unpaid costs and expenses of the arbitration.

By memorandum decision dated September 30, 2003, I denied Rubens's motion and granted defendants' motion by dismissing Rubens's claims and awarding reasonable costs and expenses to defendants.[16] Rubens appealed. On October 26, 2004, the Second Circuit reversed that part of my decision dismissing Rubens's claims as to liability and remanded the case for further proceedings. See Rubens, 387 F.3d at 193. The reversal rested on limited grounds -- this Court's reliance on an affidavit from the arbitrator stating that he would have ruled the same way even if the alleged legal malpractice had not occurred. See id. at 185.

On remand, defendants filed a second motion for summary judgment on May 20, 2005. Rubens filed her opposition to the motion on July 1, 2005.[17]

---

[16] Defendants' motion was denied in part because I dismissed that prong of their counterclaim seeking fees and costs incurred in collecting expenses pursuant to the indemnification provision of the retainer agreement.

[17] To the extent defendants have objected to Rubens's submissions, their objections are overruled.

## DISCUSSION

I first discuss the legal standards applicable to summary judgment motions and legal malpractice claims. Then, I apply these standards to evaluate the purportedly negligent acts that form the basis of Rubens's legal malpractice claim.

## A. Applicable Law

### 1. Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus., 475 U.S. at 586. There is no issue for trial unless

there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. <u>Anderson</u>, 477 U.S. at 249. As the Court held in <u>Anderson</u>, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50 (internal citations omitted). The plaintiff must provide the Court with some basis to believe that her "version of relevant events is not fanciful." <u>Christian Dior-N.Y., Inc. v. Koret, Inc.</u>, 792 F.2d 34, 38 (2d Cir. 1986) (internal quotations omitted).

## 2. **Legal Malpractice**

To succeed on a claim for legal malpractice under New York law,[18] a plaintiff must establish: "'(1) a duty, (2) a breach of the duty, and (3) proof that actual damages were proximately caused by the breach of the duty.'" <u>Tinelli v. Redl</u>, 199 F.3d 603, 606 (2d Cir. 1999) (quoting <u>Marshall v. Nacht</u>, 569 N.Y.S.2d 113, 114 (2d Dep't 1991)). On a motion for summary judgment in a legal malpractice action, a defendant may prevail by demonstrating the plaintiff's inability to prove one of the three elements. <u>Carney v. Philippone</u>, 332 F.3d 163, 167 (2d Cir.

---

[18]     The Court applies New York law to the legal malpractice claim because the arbitration was held in New York and thus services were provided in New York. Moreover, both MKM and Rubens apply New York law. In any event, there is no conflict, because Maryland law is not substantially different from New York law as it pertains to legal malpractice actions. <u>See, e.g.</u>, <u>Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.</u>, 133 F. Supp. 2d 747, 755 (D. Md. 2001).

2003); <u>Hatfield v. Herz</u>, 109 F. Supp. 2d 174, 179 (S.D.N.Y. 2000).

First, a plaintiff must establish the standard of professional care in the legal community. <u>Hatfield</u>, 109 F. Supp. 2d at 179. Such a showing usually requires expert opinion, unless the "ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service." <u>Nobile v. Schwartz</u>, 265 F. Supp. 2d 282, 288 (S.D.N.Y. 2003) (internal quotations omitted).

Second, a plaintiff must show that the attorney's conduct fell short of the standard of care through a "'fail[ure] to exercise that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community.'" <u>Id.</u> (quoting <u>675 Chelsea Corp. v. Lebensfeld</u>, No. 95 Civ. 6239 (SS), 1997 WL 576089, at *2 (S.D.N.Y. Sept. 17, 1997)). Lawyers "are not guarantors of a favorable outcome in litigation," and their reasonable strategic decisions made in the course of representing a client do not amount to malpractice. <u>Ayala v. Fischman</u>, No. 97 Civ. 6698 (LMM), 2001 WL 1491292, at *4 (S.D.N.Y. Nov. 26, 2001); <u>see also</u> <u>Morrison Cohen Singer & Weinstein v. Schwartz</u>, No. 92 Civ. 1493 (TPG), 1995 WL 169032, at *3 (S.D.N.Y. Apr. 10, 1995) ("Reasonable judgments about trial strategy do not constitute negligence or malpractice."); <u>Rosner v. Paley</u>, 65 N.Y.2d 736, 738 (N.Y. 1985) ("[S]election of one among several reasonable courses of action does not constitute malpractice.").

Finally, as to the element of proximate cause: "[A] plaintiff must show that but for the defendant's negligence, he or she would have prevailed in the underlying action or would not have sustained any damages." Nobile, 265 F. Supp. 2d at 289.

## B. Application

But for defendants' negligence in their representation of her, Rubens contends, she would have prevailed in the arbitration and is now entitled to compensation from defendants on her claim of legal malpractice. She contends that defendants engaged in the following negligent conduct: (1) stipulating to the admission of the Trust's chlamydia test results; (2) failing to understand that the Trust's chlamydia test was negative; (3) failing to call witnesses to either prove that the Trust's chlamydia test was negative or to rebut the biofilm defense; (4) failing to timely disclose expert witnesses, resulting in the preclusion of their testimony, and (5) failing to rely on a presumption used in other Dalkon Shield cases, see Reichel, 109 F.3d 965.[19] Defendants argue that Rubens's claims fail as a matter of law because the alleged breaches were matters involving

---

[19] In addition, Rubens claims that defendants' failure to timely serve supplemental pre-hearing disclosures, resulting in preclusion of various documents, constitutes legal malpractice. With the exception of the failure to timely disclose Rubens's test, addressed below, Rubens provides no evidence to show how such late disclosures caused her loss. Moreover, the arbitrator permitted Mason to use these documents on rebuttal and cross-examination. (Tr. at 660; Mason Dep. at 163). As a result, I conclude that no reasonable jury could find that but for defendants' negligent failure to timely serve their supplemental pre-hearing disclosures, Rubens would have prevailed in the arbitration.

the reasonable exercise of judgment and strategy that cannot form the basis for a malpractice claim.  They further argue that Rubens has failed to present sufficient evidence to prove that MKM's alleged deficiencies proximately caused her damages.

I discuss each of the alleged acts of negligence in turn.

### 1.  **Admission of the Trust Test Results**

The Trust test showed a "positive serological[20] result" for chlamydia (Schachter Aff. ¶ 6), while Rubens's test showed a negative result (PX 5).  Although MKM expressed its intent to object to the admissibility of the Trust test results prior to the arbitration, at the hearing, MKM and the Trust stipulated to the introduction of both tests (Tr. at 637-38; PX 14).  Rubens asserts that but for the stipulation to admit them, the Trust's chlamydia test results would not have been introduced into evidence at the arbitration due to lack of foundation.  And without a positive chlamydia test, the Trust could not have argued that Rubens's PID was caused by anything other than the Dalkon Shield.  (Pl.'s Mem. at 8-11).[21]  Rubens argues it was MKM's failure to timely disclose the results of Rubens's test,

_____

[20]    Diagnosis by serology involves detecting the presence of an immune response to a disease, such as an antibody. Presence of a specified antibody indicates either active or previous infection.  (Tr. at 853).

[21]    "Pl.'s Mem." refers to plaintiff's "Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment" dated July 1, 2005.  "Def.'s Mem." refers to defendants' "Memorandum of Law in Support of Defendant Attorney's Motion for Summary Judgment" dated May 18, 2005.

not trial strategy, that led defendants to stipulate to the admission of the Trust test.  (Id. at 6; PX 23; Mason Dep. at 26).  MKM knew of Rubens's test results in June 1998 but did not disclose the evidence to the Trust until late August, after the deadline for pre-hearing disclosures had expired.  (PX 13; DX N).

In stipulating to the admission of the Trust test results, MKM did not breach its duty to exercise reasonable care or proximately cause Rubens's failure to prove her claims against the Trust.  First, a reasonable jury could only find that MKM's stipulation to admission of the Trust's test results was in exchange for the Trust's agreement to the admissibility of Rubens's test results.  This is precisely the type of exercise of reasonable judgment about trial strategy that cannot constitute legal malpractice.  See Morrison Cohen Singer, 1995 WL 169032, at *3.  It is common in civil cases for lawyers to stipulate to admissibility rather than prolong proceedings by requiring a foundation witness where there is no genuine dispute as to the document's admissibility.

Rubens's test results faced obstacles to admission because the results were initially reported in the name Roberts. "Rubens" was handwritten above the scratched-out "Roberts," and thus the legitimacy of the report could be fairly questioned. While the blood sample was drawn on June 3, 1998, Quest did not receive it until five days later, on June 8, and did not report the result until June 11.  (PX 5).  Rubens's testimony about how the test was ordered conflicted with the testimony of Payton,

Corio's lab technician.  (Tr. at 299-300, 457; Mason Dep. at

116).  The results had not been timely disclosed, and the Trust

intended to object to their admission.  (DX N).[22]  Rubens argues

that had MKM timely disclosed her test, MKM would have been able

to lay an adequate foundation for its admission.  While MKM did

fail to disclose the test results in a timely manner, the results

were still reported in a last name other than her own and would

have been objectionable for that reason as well.  Rather than

expend resources on opposing the admission of the Trust test and

ensuring the introduction of Rubens's test, it was a reasonable

judgment for MKM to stipulate the results of both tests into

evidence.

Second, even if MKM had not stipulated to its

admissibility, the Trust test was likely to be admitted in any

event, for the objections Rubens argues MKM should have but

failed to make went to weight and not admissibility of the

---

[22]     MKM further argues that the arbitrator had ordered that
any independent chlamydia test must be conducted with blood drawn
at the same time as the Trust test.  (Def.'s Mem. at 6; Mason
Dep. at 112).  But Rubens claims she was unaware of any such
order and believed that instructions to use blood drawn at the
same time for an independent test was merely for her convenience
and not a mandatory condition.  (Pl.'s Mem. at 5-6; Rubens Dep.
at 189).  I am sure that an order existed as Rubens only had her
blood drawn at the Trust's request, after Pretl had opposed the
testing, and in the presence of a Trust representative.  (Tr. at
298;); see In re A.H. Robins Co., 232 B.R. at 857.  Moreover,
the applicable rules only authorize such medical examinations
pursuant to an order.  (DX F (Rule 12)).  The order is not in the
record, however, and MKM does not offer admissible evidence of
the contents of the order.  As factual disputes on summary
judgment motion should be resolved in favor of the non-moving
party, for purposes of this decision, I accept Rubens's assertion
that the order did not call for her to have blood drawn for an
independent test at the same time as the Trust test.

evidence.[23]  Rubens makes two main arguments in this respect.
She first argues that the Trust test was inadmissible because the
Trust had not named a witness in its pre-hearing disclosures who
would testify as to the chain of custody for Rubens's blood
specimen.  (Pl.'s Mem. at 9).[24]  Establishing chain of custody is
a method of authenticating physical evidence under Federal Rule
of Evidence 901, United States v. Gelzer, 50 F.3d 1133, 1140 (2d
Cir. 1995), but a break in the chain of custody bears upon
credibility of the evidence and "does not necessarily result in
the exclusion of [ ] physical evidence," id., at 1141; accord
United States v. Morrison, 153 F.3d 34, 57 (2d Cir. 1998); see
also Gucci Am., Inc. v. Ashley Reed Trading, Inc., No. 00 Civ.
6041 (RCC), 2003 WL 22327162, at *5 (S.D.N.Y. Oct. 10, 2003)
(applying Gelzer in a civil case).  Under Rule 901(a),
authentication "is satisfied by evidence sufficient to support a
finding that the matter in question is what its proponent

_____

[23]     While Mason stated an intent to object to the Trust
test in a letter to Trust counsel, he offered a reasonable
explanation that such statement was made as part of a trial
strategy to procure the admission of Rubens's test through a
stipulation.  (PX 14; Mason Dep. at 188-89).

[24]     Rubens also argues that Arbitration Rule 12(b) requires
the Trust to deliver a "detailed" written report that "set[s] out
the findings of the physician, including results of all tests
made, diagnoses and conclusions."  Such report is only required,
however, upon plaintiff's request.  (DX F).  MKM's failure to
request such a report could have been a reasonable strategic
decision, as it is possible such written findings would have been
more damaging than helpful to plaintiff's case.  Rubens also
suggests the Trust test report might not be hers because it does
not bear her name or other identifying information, but a form
linking her blood specimen to the report and bearing her
signature was admitted at the hearing along with the Trust test.
(Tr. at 638-39).

- 24 -

claims." Fed. R. Ev. 901(a).  Accordingly, Rubens's challenge to
the chain of custody goes to the weight of the evidence, and not
admissibility, so that it would not have provided a valid basis
for exclusion of the Trust test.

Third, MKM merely stipulated to the admissibility of
the Trust test results, not to the fact that the results proved
Rubens had genital chlamydia.  To the contrary, MKM continued to
vigorously argue that Rubens never had chlamydia.

Rubens next argues that her blood may have been
tampered with because the Trust representative did not observe
protocol when it was drawn for the Trust test: "[A]s the
technician released the needle from my arm[,] the para legal
[sic] grabbed the open vial and literally ran out of the office
with it and disappeared."  (Rubens Aff. dated 6/29/05 ¶ 8; see
also Pl.'s Mem. at 8).  But the Trust was prepared to provide
evidence to authenticate its test results if MKM had raised an
objection; the Trust paralegal was present and ready to testify
at the hearing.  (Tr. at 636; DXs L & T).  As Rubens's arguments
about the improper procedure in her testing go to the weight of
the evidence, not admissibility, the Trust test was likely to be
admitted, and no reasonable jury could conclude that defendants'
act of stipulating to its admission breached their duty to use
reasonable care or proximately caused Rubens's damages.

## 2. Misunderstanding the Trust Test Results

In his opening, Mason stated that "[t]here are two
different tests.  One is positive, one is negative."  (Tr. at

54). According to Rubens, he erred in characterizing the Trust test results as positive because they were actually negative. She asserts that Mason "failed to understand" that the Trust test "was in fact proof that plaintiff had not been exposed to genital chlamydia." (Pl.'s Mem. at 14). This assertion is clearly contradicted by the record. With the benefit of hindsight, the reference to the Trust test as positive might have been a poor choice of words, but it is clear that Mason vigorously argued that the "positive" test result did not constitute persuasive proof that Rubens actually had genital chlamydia.

Mason sought to discredit the Trust test result as proof that Rubens had chlamydia in 1987 in two ways. First, he elicited testimony from Rubens's treating physician, Paley, on how the positive result for genital chlamydia could be due to "cross-reactivity" to another species of chlamydia, one that does not cause PID. (Tr. at 390, 394, 440-41; Mason Dep. at 107-10). Second, he argued in his opening and elicited testimony that a positive titer in 1998 did not prove that Rubens had chlamydia when she was diagnosed with PID, eleven years earlier. (Tr. at 57, 111-12, 196-97, 389). Clearly, Mason fully understood that a positive chlamydia test could be the result of cross reactivity, rather than an indicator that Rubens actually had chlamydia.

Moreover, it was understandable for Mason to call the Trust test positive. Others had referred to it as a positive result at one time or another, including Rubens and her husband, her treating physician Paley, the arbitrator, and the Trust

attorneys.  Either Rubens or her husband had described the Trust
titer as positive to both Mason and a microbiologist they
consulted for this litigation, Julius Schachter.  (PX 4;
Schachter Aff. ¶ 3).  After reviewing the Trust test results,
Schachter described the test in technical terms as a "positive
serologic result for genital chlamydia," but attributed that
result to "a cross-reaction to a different species of Chlamydia."
(Schachter Aff. ¶¶ 5-6) (emphasis added).  The Trust lawyer
referred to the positive test in her opening.  (Tr. at 61).
Minkin also referred to the Trust test as an antibody titer that
revealed past chlamydia infection (Tr. at 557), and the
arbitrator adopted as fact that there had been "two conflicting
chlamydia titers" (Dec. at 3).

Indeed, the Trust test, with a titer for genital
chlamydia of 1:32, was in fact positive under the standards of
the Indiana University Lab, where a titer of 1:8 or higher was
considered a positive result.  (Tr. at 392-93; PX 12).[25]  A
reasonable argument could be made that the Indiana Lab used a
standard that was too low or incorrect because it did not take
into account cross-reaction with other species of chlamydia.
(See Schachter Aff. ¶¶ 5-6; Sweet Aff. at 2).  Indeed, Mason made
that argument through testimony elicited at the hearing.  (See,

---

[25]    Even under the Quest Lab standards, an IgG titer for
genital chlamydia of 1:32 was an equivocal positive result.  (PX
5).

e.g., Tr. at 392-93).[26]  His failure to persuade the arbitrator
of its merit does not constitute malpractice.

Thus, no reasonable jury could find proximate causation
on this ground because Mason's characterization of the test as
positive could not be labeled a but for cause of Rubens's
arbitration loss.

### 3.  **Failure to Call Certain Witnesses**

The Trust presented two defenses at arbitration to
rebut Rubens's claim that the Dalkon Shield caused her PID.
Their experts testified that (1) the PID was caused by chlamydia
and (2) the formation of biofilm prevented the wicking of
bacteria, the method by which Rubens claimed the Dalkon Shield
caused her PID.  According to Rubens, MKM should have called
additional expert witnesses, such as Richard Sweet or Julius
Schachter, to testify that the Trust test was actually negative
for chlamydia and to rebut the biofilm theory.  Rubens contends
it was MKM's negligence in failing to file timely disclosures and
contact witnesses that prevented testimony from these additional
experts.  (Pl.'s Mem. at 11, 13).  The argument fails, as a
matter of law, for MKM's failure to call these witnesses did not

_____

[26]     Because the titer for c. pneumoniae was four times
greater than the titer for genital chlamydia, 1:128 versus 1:32,
one could argue, as Mason did, that the positive result
demonstrates cross-reactivity among the two species.  (See PX 5;
Mason Dep. at 109-10, 136-37; Schachter Aff. ¶ 6).  But the
Trust's expert, microbiologist Martin Wilder, testified that the
c. pneumoniae titer would have had to be 1:256 or higher to
demonstrate cross-reactivity, so there still would have been a
dispute on this point.  (Tr. at 870-71).

constitute malpractice.  The decision to present certain
witnesses was one of reasonable trial strategy, and in any event,
a reasonable jury could not find that either witness would have
changed the outcome of the arbitration.

First, an attorney's decision whether to call a witness
is one of reasonable trial strategy that generally does not
constitute legal malpractice.  See Estate of Re v. Kornstein
Veisz & Wexler, 958 F. Supp. 907, 923 (S.D.N.Y. 1997) ("An
attorney's reasonable decisions relating to . . . witness
presentation . . . are not subject to second guessing in an
action for malpractice.").  While a client may disagree with her
counsel's decision not to present a witness, this difference of
opinion as to optimal trial strategy does not raise a genuine
issue of material fact.  See Hatfield, 109 F. Supp. 2d at 183
("Although the parties clearly differ as to whether calling [the
witness] was essential to the success of the . . . defense, their
difference of opinion does not raise a genuine issue of material
fact.").  Here, MKM's decision not to call more expert witnesses
was understandable for strategic and practical reasons, including
time constraints on the hearing, the quality and quantity of
testimony already presented, the fact that disclosure deadlines
had passed, the added expense, the Trust's familiarity with the
witnesses, and the ability to rely on Sweet's writings on cross-
examination.

The hearing was limited to three days, leaving MKM with just a day and a half to present Rubens's case.[27] MKM had seven witnesses testify. For the most part, Sweet's testimony would have been cumulative and would have required MKM to cut the testimony of other witnesses. (Mason Dep. at 74-75). In addition, the pre-hearing expert disclosures had already been served by Rubens's prior attorney, and discovery deadlines had not been extended. (Id. at 61, 63-65).[28]

Mason also considered the financial burden to Rubens of compensating additional witnesses. Sweet charged $500 an hour, and his testimony, including preparation time, would have cost several thousand dollars. Based on Rubens's payment history with MKM and discussions with Rubens and her husband, Mason understood that "costs were a big issue for them." (Id. at 63-64). Over the course of MKM's representation of Rubens, various costs and expenses accrued and her account fell into arrears. (Mason Aff.

---

[27] There are frequent indications in the hearing transcript of the time pressure under which Mason was operating. For example, the following exchange took place while Mason cross-examined Wilder, an expert witness for the Trust, on the final day:

> A.    We can argue about this all day.
> Q.    . . . [N]o, we can't argue it all day.
>       Our court reporter will die, and our chairman will
>       smack us in the head. I've got to get it wrapped
>       up here.
> THE HEARING OFFICER:  Hopefully we're wrapping up?
> MR. MASON:  Yes, we are.

(Tr. at 927).

[28] I discuss the issue of timely disclosure in greater depth in the following section, Part B.4. at 32.

dated 11/12/02 ¶ 8).  Despite numerous letters requesting payment, Rubens did not pay most of the bills.  (Id. ¶¶ 8, 11 & Ex. A).  Mason also believed Rubens had not paid Pretl for depositions taken in April and May 1998.  (Mason Dep. at 66-67).

In addition, Sweet was a familiar face to the Trust's lawyers from prior Dalkon Shield litigation.  Therefore, Mason was understandably concerned that the Trust had much material to work with in cross-examining Sweet.  (DX L; Mason Dep. at 70-71). Instead of calling Sweet to testify, Mason was able to bring out Sweet's theories on wicking and biofilm on cross-examination of the Trust's experts, albeit not quite as effectively as Mason claims.  (Tr. at 908-10).

Rubens also contends MKM should have called a microbiologist, like Schachter, to counter the testimony of the Trust's experts.  (Pl.'s Mem. at 13).  This argument fails for the same reasons as her arguments that MKM should have had Sweet testify.  Given the time constraints, expense, and cumulativeness of the testimony, it was reasonable for MKM not to call additional expert witnesses.

Second, no reasonable jury could conclude that any particular witness would have changed the outcome of the arbitration.  MKM presented the two experts that Rubens's prior attorney had designated in pre-hearing disclosures, Paley and Dodek, both of whom were reasonably qualified: Paley offered a unique perspective, having been Rubens's treating physician who actually removed the IUD, and Dodek was a specialist in

- 31 -

obstetrics, gynecology, and infertility, who had served as an expert consultant in dozens of Dalkon Shield cases and testified in at least ten of them.  (Dec. 3-5; Tr. at 89, 368-69; Mason Dep. at 53).

        In his decision, the arbitrator noted that Dodek was not an expert on biofilm and Paley was not an expert on infectious diseases.  (Dec. at 3, 5).  Rubens argues that had MKM offered better experts, like Sweet and Shachter, she would have prevailed.  (Pl.'s Mem. at 13).  Even if Sweet or Schachter were better credentialed witnesses than Dodek or Paley, MKM's failure to call them does not fall below "that degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community." Nobile, 265 F. Supp. 2d at 288.  Rubens's argument is "precisely the sort of 'second[]guessing of counsel's strategic judgment . . . [that] do[es] not rise to the level of legal malpractice.'" Estate of Re, 958 F. Supp. at 923 (quoting Pacesetter Communic'ns Corp. v. Solin & Breindel, P.C., 541 N.Y.S.2d 404, 406 (1st Dep't 1989)).

        Accordingly, I hold that no reasonable jury could conclude that MKM's failure to call certain witnesses at the arbitration was a breach of duty and that, but for that failure, she would have prevailed.

### 4.   Untimely Disclosure of Witnesses

        Rubens also claims that MKM's failure to disclose Sweet and Corio as witnesses in a timely fashion precluded their testimony at the arbitration and led to the unfavorable decision.

(Pl.'s Mem. at 16-18).  Because no reasonable jury could find
that Rubens would have prevailed at the arbitration if Mason had
called these witnesses to testify over others, summary judgment
is granted to MKM on this ground as well.

Rubens argues it was Mason's oversight in missing
deadlines, not any strategic concern, that precluded Sweet from
testifying.  While Mason did fail to make timely disclosures, the
record does not show that the arbitrator would have precluded him
from adding Sweet as a witness.  What is clear is that expert
witness disclosures were included in the pre-hearing disclosures
submitted on May 22, 1998 by Pretl, Rubens's former attorney.
(PX 27).  These disclosures were served well before MKM assumed
representation of Rubens in June 1998.  (Mason Aff. dated
12/12/02 ¶ 8).  Discovery deadlines, including the time for
taking depositions and making expert disclosures, had already
expired and no extensions had been granted.  (Mason Dep. at 64-
65; see PX 2 (Rule 8)).[29]

MKM could have attempted to amend the expert
disclosures up to sixty days prior to the hearing and did in fact

_____

[29]     At the time MKM's representation of Rubens began, the
arbitration was still scheduled for August 17, 1998.  Accepting
Rubens's assertion that she hired MKM at their first meeting on
June 15, 1998, MKM would have had just four days to serve expert
disclosures under the sixty-day deadline in Arbitration Rule 8.
(See PX 2).  The first indication in the record that Mason was
aware of Sweet as a potential witness is not until July 1, 1998,
after the expert disclosure deadline for the initial arbitration
date had expired.  (PX 4).  Moreover, Rubens did not actually
return a signed retainer until July 20, 1998.  (Ronemus Aff.
dated 11/14/02 Ex. 17).  While the hearing was eventually
postponed to September 14, 1998, nothing in the record indicates
that the deadlines for disclosure were also extended.

try to designate Corio as a witness in an untimely supplemental pre-hearing disclosure served on September 1, 1998. (PX 23). The fact that Mason did not also attempt to supplement the pre-hearing disclosures by designating Sweet as a witness at the same time he named Corio is consistent with a deliberate choice not to have Sweet testify. Even with the late disclosures, MKM did have the option, which Mason mentioned to Rubens in a letter in July 1998, of calling Sweet as a rebuttal witness. (PX 4). This further suggests that omitting Sweet as a witness was a reasoned choice rather than negligence.[30]

MKM listed Corio as a witness on its untimely disclosure in September 1998 but did not call Corio as a witness because it determined Corio's testimony was not essential: "[W]e determined for strategic reasons that there would be no reason to call [Corio] as a witness. She couldn't testify with personal knowledge as to the test itself." (Mason Dep. at 123). Instead, MKM called Kelly Payton, the lab technician who actually drew Rubens's blood sample and sent it to the lab for analysis. (See Tr. at 453-57; Mason Dep. at 124).

---

[30] Rubens further contends that Mason never made preparations for Sweet to appear at the hearing. (Pl.'s Mem. at 11-12). While Sweet states that MKM did not contact him "before the arbitration or at any time to schedule [his] testimony or ask [him] to be on call" (Sweet Aff. dated 6/30/05 ¶ 6), it is apparent that Mason gathered information about Sweet from some source: Mason knew the nature of Sweet's potential testimony, as shown by the articles he relied on in cross, and had details about the charge for Sweet's services. Therefore, Mason had a reasonable basis for deciding not to call Sweet as a witness.

Because the decisions not to call Sweet and Corio were strategic in nature and Rubens cannot show that she would have prevailed in the arbitration if Sweet and Corio had testified, no reasonable jury could find that untimely disclosure of these witnesses was the proximate cause of Rubens's arbitration loss. See Hatfield, 109 F. Supp. 2d at 183 ("[D]efendant's determination not to call the witness in the underlying action was clearly a reasonable strategic decision which did not constitute malpractice." (internal quotations omitted)).

### 5. **Failure to Introduce the Reichel Presumption**

The Reichel presumption is a rebuttable presumption applicable to Dalkon Shield litigation that favors the plaintiff on causation. If Rubens could prove that she was using the Dalkon Shield when she got PID, the Dalkon Shield was presumed to have caused the injury, unless the Trust presented evidence to the contrary. See generally Reichel v. Dalkon Shield Claimants Trust, 109 F.3d 965 (4th Cir. 1997) (describing the presumption). According to Rubens, MKM did not rely on this presumption at the arbitration. She claims that if the Trust's chlamydia test had not been admitted into evidence, the Reichel presumption would have resulted in an arbitration decision in her favor. (See Pl.'s Mem. at 15-16; Golomb Aff. ¶ 6). MKM argues that the presumption, although generally applicable to Rubens's case, had been rebutted and was therefore unavailable as a tactic to prove causation. (Def.'s Mem. at 12-13).

Despite MKM's failure to assert that the Reichel presumption applied in the arbitration, the presumption would have been defeated anyway by either of the Trust's two defenses: (1) chlamydia as the cause of Rubens's PID or (2) the biofilm theory as a reason that wicking from the Dalkon Shield could not have caused her PID. The presumption does not shift the burden of proof; it only shifts the burden of production. Once the Trust offered any evidence as to either of these defenses, the "case [would be] left in the same situation as if no presumption had ever been applicable." Reichel, 109 F.3d at 968. Even if the Trust had been precluded from offering evidence of a positive chlamydia result for Rubens, the Trust would still have presented expert testimony on the biofilm defense.[31] At that point, the presumption would no longer have factored into the arbitrator's decision.

Rubens is therefore unable to show that MKM's failure to introduce the Reichel presumption at the arbitration proximately caused the arbitrator to decide against her. No reasonable jury could conclude otherwise.

---

[31] For reasons discussed above in Part B.3 at 28, no reasonable jury could conclude that, as Rubens asserts, if MKM had only presented expert witnesses to testify that the biofilm theory was "junk science," she would have prevailed because that defense would have been discredited in the arbitrator's eyes. (Pl.'s Mem. at 13).

## CONCLUSION

For the foregoing reasons, MKM's motion for summary judgment is granted.  The Clerk of the Court shall enter judgment dismissing Rubens's claims, with prejudice and with costs.

SO ORDERED.

Dated:    New York, New York
          February 15, 2006

DENNY CHIN
United States District Judge